# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 1:04CR00056-011 |
| v. | ) **OPINION AND ORDER** |
| | ) |
| **EARL JACKSON "ROHO"** | ) By: James P. Jones |
| **LESTER, JR.**, | ) Chief United States District Judge |
| Defendant. | ) |

*Thomas J. Bondurant, Jr., and Jennifer R. Bockhorst, Assistant United States Attorneys, Roanoke and Abingdon, Virginia, for United States of America; E. Gay Leonard, Abingdon, Virginia, for Defendant Earl Jackson "Roho" Lester, Jr.*

The defendant Earl Jackson "Roho" Lester, Jr., has objected to the calculation of his guideline range for sentencing purposes. A hearing was held on his objections and this opinion sets forth the rulings of the court.

I

In this prosecution, dubbed "Operation Big Coon Dog" by the government, sixteen defendants, including seven public officials or employees, have been convicted of federal offenses primarily arising out of a bribery and bid-rigging scheme to repair flood damage in Buchanan County, Virginia. As explained in the

presentence investigation report ("PSR") prepared by a probation officer of this court, and uncontested by the defendant:

> While there are several instances of corruption involved in the conduct of the defendants, the majority of the criminal conduct in this case began following the "Hurley Flood of 2002" and some minor floods which occurred in the spring of 2003. Hurley, a small community in Buchanan County, Virginia, lies within the Knox District and the supervisor during the time frame of the illegal conduct was Stuart Ray Blankenship.
>
> After a series of heavy rains on May 2, 2002, Buchanan County was seriously flooded with damages totaling approximately 50 million dollars and the loss of two lives. The hardest hit area was near Hurley in the Knox district. This damage included the destruction of houses, businesses, roads and bridges. The subsequent cleanup work involved removing flood debris from the creeks so that they would not become obstructed and flood again; to rebuild damaged roads and bridges; and to demolish any unsafe structures.
>
> Within days of the flood, the Federal Emergency Management Agency (FEMA) began working with the Virginia Department of Emergency Management (VDEM) to establish a public assistance program to reimburse Buchanan County for damages caused by the flood. The process calls for the county to initially pay the contractors and apply to VDEM for reimbursement for a particular project. If VDEM approves the project, the application is sent to FEMA for approval, if FEMA approves the project, the federal agency pays 75% of the cost to VDEM, who adds 23% of the cost and wires the funds to the county. The county is responsible for the final 2% of the cost, which was offset by a handling/management fee of 2% paid to the county. In relation to the Hurley flood its' agencies submitted 71 projects totaling approximately $5 million which was approved by VDEM and FEMA. The county disbursed an additional approximate amount of $2.1 million that has not yet been reimbursed by VDEM or FEMA. Therefore, the transactions involved in the instant offenses total approximately $7.1 million.

Initially FEMA and VDEM contracted with the Army Corps of Engineers, who subcontracted with Disaster Recovery Contractors (DRC) of New Orleans for debris removal from the creeks. County officials, led by Stuart Ray Blankenship, accused DRC of padding its tonnage of debris removal by randomly digging and hauling off dirt and rocks, rather than removing destructive debris from the creeks. In addition, the county officials were upset that DRC was not hiring local contractors. By June 2002, FEMA agreed with the county, refused to pay DRC a $500,000 payment, and turned over cleanup operations to county officials. However, by the time DRC was relieved of duties on June 21, 2002, it had received payments of approximately $3.2 million.

After the county became authorized to award contracts for cleanup operations, bridge repairs, construction and demolition, FEMA approved project applications if they were "reasonable" and the process of awarding a contract "complied with state law." The county board of supervisors decided that the supervisor of each district could unilaterally award contracts in that district for emergency work and could accept low bids of three contractors/participants in non-emergency work. However, the distinction between emergency and non-emergency work was not clear. In addition, the bidding process was not open, as the supervisor could choose which three contractors were to bid on a certain project. This process opened the door to bribes and bid-rigging. Supervisor Stuart Ray Blankenship of the Knox district accepted cash, expensive coon dogs, the construction of a coon dog kennel, a dog box for his truck, a motor, motor vehicles, ATVs, clothing, food, vacations, and a firearm to influence the awarding of contracts. Supervisor James Ralph "Pete" Stiltner, Jr., of the Rock Lick district accepted cash, favorable land transactions, favorable equipment transactions, clothing and a large screen TV to entice the awarding of contracts and cover-up illegal activities. County Coal Road Engineer Kenneth Morris Hale accepted cash and assisted Stuart Ray Blankenship obtain a motor. County Emergency Coordinator David Mathias Thompson accepted cash and clothing for rendering aid in the awarding of contracts. FEMA employee Gary Ray Moore accepted cash, a firearm, NASCAR tickets, football tickets, tires and construction materials to induce FEMA to keep the flow of federal money unimpeded and to "look the other way."

County Road Inspector Ricky Allen Adkins was allowed to submit falsified expense and time records because he fed the coon dogs and cleaned out the kennels belonging to Stuart Ray Blankenship, as well as mowing his lawn and bringing him lunch. The remaining defendants are the contractors who paid the bribes and rigged the bids. The specific details are as follows.

. . . .

In the summer of 2002, Hale approached Stephens and requested that a $4,000 debt at Vansant Lumber be eliminated in return to receive a contract to construct a bridge. Stephens forgave the debt. After completion of the bridge, Stephens gave Hale $1,000 in hopes of receiving additional bridge work. In June 2002, after the county took over awarding the flood contracts, it was decided to bid out six separate geographic sites in the Knox district for cleanup operations: four of the sites being locations where debris from the flood needed to be removed; one site where all the material and debris would be brought and sorted, and one site designated for dumping. Stuart Ray Blankenship did not advertise for bids and personally chose the contractors he allowed to bid on these sites: Donald Ray Matney of D&R Contractors; Earl Jackson "Roho" Lester, Jr., of Leet Construction Company; Kenneth Joseph Stephens of KJ Stephens and Associates; and Terry Gene Clevinger of Terry's Construction Company.

Blankenship told Stephens to meet with Clevinger to arrange bids, and told Matney that "you boys ought to get together and divide this up."

The four contractors, acting in concert, agreed that Matney was to receive three of the sites, Stephens was to receive two of the sites, and Clevinger was to get the contract for the reduction site. Terry Clevinger testified that Joe Stephens even filled out the bids submitted by Earl Lester and him. Lester's payoff for submitting high bids was to work as a subcontractor for Matney. When the bids were delivered and opened on July 18, 2002, Matney won the bids on all the cleanup sites and the dump site, and Clevinger won the bid on the reduction site. However, since Matney was the only one to bid on two of the cleanup sites (Sites

3 & 4), Blankenship declared those two bids to be invalid and opened them for rebid a day later. A perfect example of the corruption of the offense is reflected in these bids. The original bids for sites 3 and 4 were $177,780 and $219,016, respectively. However, the bids submitted by Earl Lester, Terry Clevinger and Joe Stephens the very next day were substantially higher than the bids submitted by Matney the previous day. The low bids, submitted by Joe Stephens, were in the amounts of $204,960 (site 3) and $253,333 (site 4). The bids submitted by Lester and Clevinger were higher, as agreed by the parties. The accepted bids on these sites were as follows: cleanup site #1 was awarded to Matney in the amount of $124,767; cleanup site #2 was awarded to Matney in the amount of $140,280; cleanup site #3 was awarded to Stephens in the amount of $204,960; cleanup site #4 was awarded to Stephens in the amount of $252,333; the dumping site was awarded to Matney in the amount of $279,540; and the reduction site was awarded to Clevinger in the amount of $288,674.

All of the bids were based on an estimated amount of tonnage for each site. If the tonnage increased, the actual payment on each contract would increase accordingly. The tonnage was fraudulently increased by the removal of non-debris matter (e.g. rocks and dirt). The actual payments made on these contracts are as follows: cleanup site #1, $177,531.40; cleanup site #2, $290,500.80; cleanup site #3, $254,477.98; cleanup site #4, $1,460,129.03; dump site, $288,851.30; and reduction site, $765,228.46. As a result, the original six contracts totaling $1,291,554, were actually paid out in the amount $3,236,718.97. As previously agreed, Matney subsequently subcontracted portions of his sites to Lester.

(PSR §§ 84-88, 91-94.)

A multicount Superceding Indictment was returned on November 18, 2004. The defendant Lester was charged with conspiracy to commit wire fraud (Count Three), 18 U.S.C.A. § 371 (West 2000), and conspiracy to commit money laundering

(Count Eleven), 18 U.S.C.A. § 1956(h) (West Supp. 2005). The defendant pleaded not guilty but on April 12, 2005, a jury convicted him of both charges.

The court directed the preparation of a PSR. In the PSR, the probation officer determined that the defendant's offense level should be calculated pursuant to United States Sentencing Guidelines Manual ("USSG") § 2S1.1(a)(2) (2004), relating to money laundering, and using the total value of the laundered funds of $3.2 million. Calculated thus, the defendant's Base Offense Level is 26, together with an enhancement because of his conviction under 18 U.S.C.A. § 1956. *See* USSG § 2S1.1(b)(2)(B) (2004). His Total Offense Level is 30, and with a Criminal History Category of I, that translates into an imprisonment range of 97 to 121 months.

II

The defendant objects to the guideline calculation contained in the PSR on two grounds: (1) that his offense level should not be enhanced by two levels for obstruction of justice; and (2) the amount of laundered funds attributable to him is excessive.

In *United States v. Booker,* 125 S.Ct. 738, 767 (2005), the Supreme Court held that the Sentencing Guidelines are not mandatory, although a sentencing court is still obligated to "consult those Guidelines and take them into account," along with the

sentencing factors set forth in 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2005). After *Booker*, the sentencing court must "first calculate (after making appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (citations omitted). Accordingly, I must determine the defendant's objections to the application of the Sentencing Guidelines.

A

The defendant argues that the PSR improperly enhanced his offense level by two levels for obstruction of justice, pursuant to USSG § 3C1.1 (2004). The probation officer based this adjustment upon his finding that the defendant committed perjury while testifying at trial. Section 3C1.1 provides that a sentencing court may impose a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." USSG § 3C1.1. The Supreme Court has held that an adjustment under this section is appropriate if the sentencing court determines that a defendant committed perjury in the course of the proceedings. *See United States v. Dunnigan*, 507 U.S. 87, 92-98 (1993). In *Dunnigan*, the Court held that for a sentencing court to increase a defendant's

sentence for perjury under § 3C1.1, the court must find that the defendant provided (1) "false testimony," (2) "concerning a material matter," (3) "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id*. at 94.

Lester testified at trial and simply denied participating in the bid-rigging scheme, as claimed by his alleged accomplices, who testified for the government. While the jury obviously disbelieved the defendant, and I believe that there was sufficient evidence for the jury to do so, I cannot make the necessary findings myself in order to impose an enhancement for perjury.

The government claims that the evidence shows that the defendant committed perjury at trial or before the grand jury, in light of his changed testimony at trial. The defendant testified at trial that prior to the bidding he had been invited into a room where he had observed his alleged accomplices secretly preparing rigged bids; he testified that he had exclaimed "wrong" and walked out of the room. (Tr. II-22-23.) In his earlier testimony before the grand jury, he had not volunteered testimony about that episode and had responded "No" to the question, "Did anyone approach you about bid rigging?" (Tr. II-42.) While the jury may have properly drawn the inference that the defendant's lack of candor before the grand jury showed a guilty

-8-

conscience, I do not find by a preponderance of the evidence that his answer was willfully false.

For these reasons, I will sustain the defendant's objection to an enhancement for obstruction of justice.

B

The defendant also objects to the amount of laundered funds attributable to him.

The money laundering guideline, USSG § 2S1.1(a) (2004), offers two successive alternatives in order to determine the Base Offense Level: (1) the offense level for the underlying offense from which the laundered funds were derived if the offense level for that offense can be determined; or otherwise (2) eight levels plus the number of offense levels from the theft, property destruction, and fraud table corresponding to the laundered funds. USSG § 2S1.1(a). The commentary to this guideline provides that alternative (2) applies to any case in which "the offense level for the underlying offense is impossible or impracticable to determine." USSG § 2S1.1, cmt. n.3(A).

The underlying offenses for the defendant's money laundering conduct are bribery and wire fraud. The guidelines for both offenses require a determination of the loss to the government from the defendant's conduct. *See* USSG §§ 2B1.1(b)

(2004), 2C1.1(b)(2) (2002). As shown by the evidence in this case, the loss to the government in this wide-ranging scheme cannot practically be determined. The bribery of those who accepted the bids for the work permitted the cost of the work to be essentially unregulated. Because of the nature of most of the work, it is now impractical, if not impossible, to determine in hindsight what the work would have cost the government had the illegal and fraudulent bids not been accepted. There is ample evidence that the cost was excessive, but no realistic way to even estimate the excess.

Accordingly, I find that the amount of money used to calculate the offense level was proper. However, because of the defendant's limited role in the offenses of conviction, I find that his Total Offense Level must be reduced.

Multiple participants in the same criminal conduct may be found to have the same or different levels of culpability depending on the circumstances of the case. The sentencing guidelines take this into account by permitting adjustments for role in the offense. *See* USSG § 3B1.2 (2004). This provision directs the court to reduce the defendant's base offense level by four levels if he was a minimal participant in the criminal activity, by two levels if he was a minor participant and by three levels if he falls between these two categories. Whether role adjustments are warranted is to be determined not only by comparing the acts of each participant in relation to the

relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts against the elements of the offense of conviction. *See United States v. Daughtrey*, 874 F.2d 213, 216 (4th Cir. 1989). A defendant bears the burden of proving by a preponderance of the evidence that he is entitled to the adjustment. *See United States v. Palinkas*, 938 F.2d 456, 460 (4th Cir. 1991), *opinion reinstated by United States v. Kockekian*, 977 F.2d 905 (4th Cir. 1992).

A defendant may play a minor role if he is less culpable than most other participants but has more than a minimal role. *See* USSG § 3B1.2 cmt. n.3. However, the court should not only compare the defendant's culpability to that of the other participants, but also measure it against the elements of the offense of conviction. *See United States v. Reavis*, 48 F.3d 763, 769 (4th Cir. 1995). The critical inquiry is thus not just whether the defendant has done fewer bad acts than the codefendants, but whether the defendant's conduct is material or essential to committing the offense. *See United States v. Palinkas*, 938 F.2d at 460.

In the present case, the defendant bribed no one and participated only in a limited way in the perpetration of the July 19, 2002, bid-rigging. While his conduct was material to commission of the offenses, his culpability is clearly lower than his codefendants and should be recognized in a lower offense level. I will thus adjust the the defendant's offense level downward by three levels.

-11-

Case 1:04-cr-00056-JPJ   Document 405   Filed 07/13/05   Page 11 of 12   Pageid#: 1459

III

For these reasons, it is **ORDERED** that the defendant's objections to the PSR are granted in part and denied in part. The defendant has a Total Offense Level of 25 and a Criminal History Category of I, for an imprisonment range of 57-71 months.

ENTER: July 13, 2005

/s/ JAMES P. JONES
Chief United States District Judge